## In re WARD LAND CLEARING & DRAINAGE, INC., Debtor(s).

### Bankruptcy No. 86–02078.

United States Bankruptcy Court,
N.D. Florida,
Panama City Division.

March 25, 1987.

**314**

E. Thomas Brushwood, Tallahassee, Fla., for U.S.F. & G.

Jerry W. Gerde, Panama City, Fla., for 1st Nat. Bank.

Clinton E. Foster, Panama City, Fla., for debtor.

## OPINION

LEWIS M. KILLIAN, JR., Bankruptcy Judge.

THIS MATTER came before the court upon a motion by United States Fidelity and Guaranty (USF & G), the surety of the debtor, for disbursement to it of the sum of $311,740.57, presently being held by the Town of Cross City (Cross City) pursuant to this court's order dated July 30, 1986. The funds being held represent proceeds on a construction contract between Ward Land Clearing & Drainage, Inc. (Ward), the debtor herein, and Cross City. An Objection and Traverse to USF & G's motion was filed by First National Bank of Panama City (FNB), a secured creditor of the debtor.

The essential facts in this case are as follows:

On August 4, 1981, a Master Surety Agreement was executed creating a relation of suretyship between USF & G as surety and Ward as principal "in connection with all bond(s) heretofore or hereafter executed ... in any penal sum and in favor of any obligee(s)...." As a contractor, Ward was required by Florida law (F.S. § 255.05) to execute a payment and performance bond with a surety insurer authorized to do business in Florida as surety prior to commencing work under any "formal contract with the state or any county, city, or political subdivision thereof, or other public authority, for the ... completion of public work."

On November 30, 1983, Ward Land Clearing & Drainage, Inc., its President, Robert P. Ward, and its Secretary, Rose C. Ward, wife of Robert P. Ward, executed a loan with FNB for working capital in the amount of $398,000.00. As security for the loan, Ward assigned to the bank and granted a security interest in: "... (a) all accounts and inventory owned by [Ward] at the date of this agreement; (b) all accounts and inventory at anytime hereafter acquired by [Ward]; (c) all [Ward's] existing contract rights which come into existence at anytime hereafter; and (d) all proceeds of all such accounts, contract rights and inventory." The bank perfected its security interest by filing a UCC–1 with the Secretary of State on December 5, 1983.

On August 8, 1985, Ward entered into a construction contract with Cross City for a partially federally financed sewer project. On August 12, 1985, performance and payment bonds were furnished by USF & G for the Cross City project.

On or about May 20, 1986, Ward ceased work on the sewer system project and filed a Chapter 11 petition in this Court on May 29, 1986. By letter to USF & G on or about June 13, 1986, Ward advised it would be unable to complete performance. USF & G, as surety, was thus called upon by Cross City to complete the contract. Under its payment and performance bonds, USF & G subsequently expended $449,316.10. The Town of Cross City is currently holding $311,740.57 in escrow in an interest bearing account pursuant to Order of this Court dated July 30, 1986 representing

the amount due for work completed under Ward's contract with Cross City.

■ 74 Am.Jur.2d, *Suretyship*, § 1 (1974) defines suretyship as a contractual relation resulting from an agreement whereby one person, the surety, assumes liability at the request of and for the benefit of another, the principal. A surety may be bound on the same instrument with his principal or on a separate instrument. Id, § 7. "The relationship between the parties need not appear from the instrument evidencing the debt." *Nelson v. Commissioner*, 281 F.2d 1 (5th Cir.1960). The equitable principle of suretyship is that when one, pursuant to obligation—not a volunteer, fulfills the duties of another, he is entitled to be subrogated to the rights of that other against third persons. *National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843 (1st Cir. 1969).

In the words of the Florida Supreme Court, the right of subrogation attaches "... at the time the contract of surety was made, and is one of the valuable rights which accrued to the surety upon its becoming obligated as such, and these rights could not be defeated by an assignment of the fund in the hands of the owner to secure a loan of money." *Union Indemnity Co. v. City of New Smyrna*, 100 Fla. 980, 130 So. 453, 456 (1930).

In the case of *Prairie State National Bank v. United States*, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed 412 (1896), the Supreme Court addressed the doctrine of subrogation holding that the right relates back to the making of the contract and is superior to any equitable lien asserted by the bank for monies advanced to the contractor without the surety's knowledge before he began to complete the work.

The Florida case of *Phifer State Bank v. Detroit Fidelity & Surety Co.*, 97 Fla. 538, 121 So. 571 (1929), followed the principles set forth in *Prairie State, supra*, citing additionally *Labbe v. Bernard*, 196 Mass. 551, 82 N.E. 688 (1907) as follows:

"While it is true that the rights of the sureties to the remedies of the principal do not become complete and are incapable of present enforcement, until they shall have discharged their principal's obligation, yet their right became an inchoate one as soon as they had entered into the relation of suretyship; and their equitable assignment of their principal's rights and remedies, when completed by their performance of his obligation, relates back as against each other and their principal, to that earlier time."

■ The surety on the facts before us was bound by the terms of the Master Surety Agreement to the payment of all claims arising out of the performance of contracts in connection with which bonds were executed. An equitable right or lien existed, therefore, in favor of USF & G from the date it entered into the relation of suretyship.

USF & G relies upon the theory of equitable subrogation to establish its rights to the funds. It contends that because its equity arose at the time it entered into the contract of suretyship under the Master Surety Agreement of August 4, 1981, its right is prior in date and paramount to that of the bank. However, under circumstances of this case, FNB challenges the priority of the surety's right vis a vis its own. Claiming a right to the contract proceeds on the basis of its security interest perfected subsequent to execution of the Master Surety Agreement but prior to posting of the performance and payment bonds, the bank contends that USF & G's failure to establish "... any security interest in and to any contract proceeds" is grounds for objection to disbursement of the funds.

By weight of authority, the doctrine of equitable subrogation in suretyship cases has not been affected by the adoption of the Uniform Commercial Code.

The case of *Framingham Trust Co. v. Gould National Batteries, Inc.*, 427 F.2d 856 (1st Cir.1970) reversed a lower court's holding that a bank's rights as assignee with a perfected security interest had priority over the subrogation rights of the performing surety. In a footnote to the opinion, the 1st Circuit noted "In so holding, the court did not place any reliance on the

priority in time of the bank's security interest, deeming this fact of 'some general equitable significance ... [but] irrelevant to an analysis of the surety's rights under the doctrine of equitable subrogation.' We agree." Id. at 857.

Security interests are, by definition, created by contract, whereas, equitable rights of subrogation are "... created by law to avoid injustice. Therefore, subrogation rights are not 'security interests' within the meaning of Article 9." *In re J.V. Gleason Co.*, 452 F.2d 1219, 1222 (8th Cir.1971) quoting *Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49, 55 (1965).

In the words of the Court in *National Shawmut Bank of Boston, supra*, at 845:

"the surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety—who may have had liens; and, not least, in the shoes of the government, for whom the job was completed.... This unique accumulation of subrogation rights serves to induce a function that is neither ordinary insurance nor ordinary financing."

The Court in *Gleason, supra*, likewise points out this conceptual difference between suretyship and ordinary financing arrangements:

"... a suretyship undertaking is not a true financing arrangement or security interest as those conceptual phrases are ordinarily and commonly used. There is no financing in the usual sense but rather a type of insurance running to the owner that insures the contractor's performance in case of default."

Following this widely accepted analysis, then, USF & G's equitable subrogation claim in the case at hand does not constitute a "security interest" under the Uniform Commercial Code. Compliance with the requirements of Article 9 was unnecessary to preserve USF & G's dominant right to the funds. First National Bank's claim to the contract proceeds solely on the basis of its perfected security interest must, therefore, fail.

What secures a surety's payment is not an assignment of accounts receivable, but the opportunity to finish the job, upon the contractor's default, and apply any available funds against its cost of completion. Prior to default, Ward had the right to assign progress payments to the bank. Upon default, however, Ward forfeited its rights under the construction contract and the surety, bound under the contract of suretyship, became obligated to complete performance. As assignee of the proceeds of the contract, FNB could acquire no right by assignment superior to the right the contractor himself might assert against the owner. *Union Indemnity, supra.*

When USF & G undertook to complete the job, it performed "... a benefit for the [Town of Cross City], and has a right to the retained funds and remaining progress money to defray its costs. The surety who undertakes to complete the project is entitled to the funds in the hands of the government not as a creditor and subject to setoff, but as a subrogee having the same rights to the funds as the government." *Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 320 (5th Cir.1967).

In completing performance upon USF & G's default, USF & G "stepped into the shoes" of the Town of Cross City and became subrogated to the town's right to apply to the cost of completion the earned but unpaid funds in its hands at the time of Ward's default. The sum of $311,740.57, together with interest earned thereon presently being held by the Town of Cross City in accordance with this Court's order dated July 30, 1986, shall, therefore, be released to USF & G for payments made to date based on its obligations undertaken under performance and payment bonds furnished for the Town of Cross City sewer system project.

Order shall enter in accordance herewith.